IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-02752-CNS-STV

COLORADO MOTOR CARRIERS ASSOCIATION,

     Plaintiff,

v.

TOWN OF VAIL, and
POLICE CHIEF RYAN KENNEY,

     Defendants.

---

## ORDER

---

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction (ECF No. 13). For the following reasons, the motion is GRANTED IN PART.

## I.  BACKGROUND

This action concerns Plaintiff Colorado Motor Carriers Association's ("CMCA's") challenge to Defendant Town of Vail's ("Vail's" or "the Town's") recently amended Ordinance restricting delivery trucks' access to the Town's two core business districts, Vail Village and Lionshead. CMCA has asserted that the Ordinance—both as originally enacted in 2022, and as amended in 2023—is expressly preempted by the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501(c) ("FAAAA"), and the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b) ("ADA"). Defendant Police Chief Ryan Kenney ("Chief Kenney") is the official responsible for enforcement of the

Ordinance at issue in this case, and he appears to be an architect of the pilot program in Vail that ultimately gave rise to the Ordinance (*see* ECF No. 21 at 72:17–23; *see also* P.I. Exs. 15, 16, 18). Below, the Court sets forth a brief recitation of Vail's enactment of the Ordinance, as well as the post-Ordinance impacts felt by CMCA Members.

### A.  The Town of Vail, its E-Vail Courier Program, and the Ordinance

Vail is a world-renowned mountain community and ski destination in Colorado with a high tourist presence (*see* ECF No. 15 at 2). Vail Village and Lionshead (together, the "Pedestrian Mall Areas") sit at opposite ends at the base of the Vail Ski Resort (*see id.*; *see also* P.I. Exs. 1, 2). The streets in the Pedestrian Mall Areas are lined on either side with shops, restaurants, hotels, and small businesses (*see* P.I. Exs. 1, 2). The streets themselves are not "streets" in the traditional sense—they are somewhat narrow, paved with cobblestones or heated pavers, and do not have curbs, gutters, painted lines, traffic signals, or posted speed limits (*see* P.I. Ex. 6; *see also* ECF No. 21 at 55:1–56:2, 73:9–25, 112:8–19; ECF No. 26 at 5:14–20, 53:15–17). Historically, pedestrians and motor vehicles have shared these narrow cobblestone streets in navigating the Pedestrian Mall Areas (*see* P.I. Ex. 6; *see also* ECF No. 21 at 79:4–12, 131:14–16).

As early as the 1970s, the Town sought to restrict the passage of vehicles through the Pedestrian Mall Areas to reserve them as true pedestrian walkways. In passing Resolution No. 17, Series 1977, for instance, the Town expressed its intent "that the pedestrian mall areas would be for the principal use of pedestrians and bicycle traffic, and motor vehicular traffic would be prohibited" (P.I. Ex. 5, § 4). As Vail developed over the years, the volume of both pedestrian and vehicular traffic increased significantly (ECF No.

2

21 at 79:4–12; *see* ECF No. 25 at 00:00–00:36). The Town made "minor changes" to its loading and delivery protocols, but these failed to remedy the high delivery vehicle presence in the Pedestrian Mall Areas (*see* P.I. Ex. 15 at 1). As then-Commander Kenney put it, "[t]rucks of all types and sizes litter the narrow streets of the village and take away from the rustic ski village experience" (*id.*). Congestion from parked and idling delivery vehicles also hampered access for police and fire rescue vehicles responding to emergency calls in the Pedestrian Mall Areas (*see* ECF No. 21 at 131:17–134:11; ECF No. 26 at 69:8–73:1).

In 2019, the Town—observing that the high volume of delivery trucks "continues to be a problem and one of the largest detractors of a positive guest experience"—directed a review[1] of the Pedestrian Mall Areas' loading and delivery protocols (*see* P.I. Ex. 15 at 1). To that end, a Loading and Delivery Work Group was created, comprising a wide range of public officials and departments in Vail[2] (P.I. Ex. 18 at 1). As part of its review, the Work Group consulted with the dockmasters of the five existing underground docks in Vail Village, who "unanimously reported that the loading docks are very underutilized" (*see* P.I. Ex. 15 at 1; *see also* P.I. Ex. 20 at 1). The Work Group also

---

[1] At some point before 2022, the Town separately conducted a study of the potential risks that operating motor vehicles posed to pedestrians in the Pedestrian Mall Areas. Chief Kenney had not reviewed this study in the course of his research, nor is it clear whether the Work Group considered the study as it devised changes to the Pedestrian Mall Areas' loading and delivery protocols (*see* ECF No. 21, 72:2–73:8). Neither party admitted the study into evidence.

[2] These included Vail's Town Manager, Deputy Town Manager, Town Clerk, Police, Fire, Finance, Public Works, Environmental, Transportation, Communications, Community Development, and Vail Resorts (P.I. Ex. 18 at 1).

conducted multiple meetings with business owners, hotel management and delivery companies in Vail Village. The "resounding consensus" from those meetings was the importance of keeping "the Vail guest experience at the highest level and that load and delivery was negatively impacting the guest experience" (P.I. Ex. 15 at 1–2).

On April 2, 2021, at the conclusion of this review period, then-Commander Kenney submitted a memo to the Town Council recommending a six-month pilot program for the implementation of a "last mile delivery" system in Vail Village[3] (*see* P.I. Ex. 15 at 3). In multiple press releases, Vail announced that the purpose of this new "E-Vail Courier" program was to "improve the guest experience by reducing the number of oversize vehicles in the pedestrian areas and reduce greenhouse gas emissions through the use of electric vehicles for the final leg of deliveries" (P.I. Ex. 21 at 1; P.I. Ex. 22 at 1; *accord* P.I. Ex. 23 at 1; P.I. Ex. 24 at 1). Chief Kenney echoed these sentiments in an online podcast interview: "Loading and delivery has been such an issue in the village, and what we're trying to do is improve our guest experience while also benefiting the environment as much as we can with electric delivery vehicles. You know, somedays there's wall-to-wall 18-wheelers down there unloading" (P.I. Ex. 26 at 00:22–00:44). Vail's then-mayor added: "And it's just not a great look when there's trucks, delivery trucks, parked there blocking the view. Not to mention the noise they create. We're a pedestrian village, so we should do everything we can to enhance that pedestrian experience" (*id.* at 00:56–01:10).

---

[3] Deliveries to Lionshead were excluded from the pilot program "due to the long-term success of a centralized underground loading dock at Arrabelle at Vail Square" (P.I. Ex. 20 at 1; *see* P.I. Ex. 32 at 5). As a result, the Ordinance's effect on Lionshead deliveries appears to be minimal.

Under the E-Vail Courier pilot program, participating delivery companies' trucks would be rerouted to one of the five underground loading docks in Vail Village. From there, the trucks would tender their goods to 106 West Logistics—the Town's exclusive delivery contractor—whose staff would load those goods onto small electric carts and transport them to their final destinations (*see* P.I. Ex. 15 at 3; *see also* P.I. Ex. 20; P.I. Ex. 22 at 3). Vail launched this pilot program with 106 West Logistics and Vail Resorts in November 2021 (*see* P.I. Ex. 18 at 1; P.I. Ex. 22). Following its launch, the results of the pilot were deemed "very positive"—the E-Vail Courier program had "contract[ed] with over 50 delivery companies, remove[d] an average of 140 trucks per week from the Village Core and deliver[ed] an average of 30,000 packages of food per week during busy season" (P.I. Ex. 17 at 1).

Similarly, during its 2021 Year in Review presentation, the Town lauded the E-Vail Courier program for its role in "reduc[ing] truck idling and improv[ing] the visual aesthetics and overall guest experience in Vail Village" (P.I. Ex. 30 at 15; *see id.* ("It's getting easier to capture that postcard image of the Gore Range from Vail Village now that nearly half of the usual oversize delivery trucks have gone underground."); *see also* ECF No. 25 at 01:00–01:30 ("I used to come into town in the morning early, and there would be trucks blocking our iconic view of the Gore Range, sitting there idling, people loading and unloading. . . . [The E-Vail Courier program] has increased our guest experience, I think, ten-fold. I don't think we've done something this valuable to our guest experience in a lot of years. And personally, from a business standpoint, it's been efficient.")).

On July 28, 2022, then-Commander Kenney submitted another memo to the Town Council recommending that the E-Vail Courier program be made permanent and expanded to cover deliveries in Lionshead (*see* P.I. Ex. 18 at 1–2; *see also* P.I. Exs. 23, 24). The memo proposed amendments to the Vail Town Code that would restrict the flow of motor vehicle traffic in the Pedestrian Mall Areas (P.I. Ex. 18 at 3). The memo further proposed that the program be funded in part by annual dock permits to be purchased by delivery companies using any loading dock in Vail Village or Lionshead (*id.* at 2). Separately, a memo from Vail's Finance Department to the Town Council on January 17, 2023, indicated that the program would also be subsidized by a line item in the Town's Community and Guest Services budget[4] (*see* P.I. Ex. 19 at 8).

In any event, on August 16, 2022, the Town enacted Ordinance No. 15, Series 2022 (the "Original Ordinance") (*see* P.I. Ex. 4; *see also* P.I. Ex. 32 at 4–5). The Original Ordinance specified that the purpose of this new regulation was "to increase the safety of pedestrian traffic in pedestrian mall areas, improve the guest experience, and reduce environmental impacts caused by vehicular traffic in pedestrian mall areas." *Vail Town Code* § 7-11-1. To that end, the Original Ordinance provided that "all vehicular traffic is prohibited from accessing or using a pedestrian mall area." *Id.*, § 7-11-3(A). The Original Ordinance enumerated several exceptions to this prohibition, including (1) public transportation vehicles; (2) emergency vehicles; (3) vehicles owned or specially permitted by the Town; (4) Town-approved contractors delivering commercial goods; (5) armored

---

[4] Perhaps tellingly, the proposed funding for the E-Vail Courier program would not derive from the Town's Public Safety budget (*see* P.I. Ex. 19 at 8).

money vehicles; (6) waste and recycling collection vehicles; (7) vehicles entering or exiting a parking structure to access a business or residence; (8) property owners and their guests actively loading or unloading; (9) guests checking in or out of any accommodation establishment located in the Pedestrian Mall Areas; and (10) high-volume commercial carriers ("HVCCs")—defined as those carriers "that, on more than five (5) days per week, deliver[ ] a high volume and variety of commercial goods, excluding food and beverage, to multiple recipients in the Town." *Id.*, §§ 7-11-4, 7-12-2.

On July 25, 2023, Chief Kenney submitted yet another memo to the Town Council noting that since its full implementation, the E-Vail Courier program had "successfully decreased vehicular traffic and drastically improved the guest experience" in the Pedestrian Mall Areas (ECF No. 16 at 1). The memo observed, however, that even after the Original Ordinance's enactment, "[t]he three major HVCC[s], UPS, FedEx and DHL[,] all have a strong presence in the Village," that on most days, "FedEx and UPS will spend four to six hours delivering in the Village," and that the police department had "received an increase in complaints on HVCC[s] this summer" [5] (*id.*). The memo thus concluded by recommending that HVCCs be wholly removed from the Pedestrian Mall Areas and included within the E-Vail Courier program's coverage (*see id.* at 1, 2).

Accordingly, on October 3, 2023, the Town enacted Ordinance No. 18, Series 2023 (the "Amended Ordinance"), which amended the Original Ordinance to remove the HVCC exception but left all other exceptions enumerated in the Original Ordinance intact (*see*

---

[5] No extrinsic evidence was offered to substantiate this increased volume of complaints against HVCCs.

P.I. Ex. 3). In effect, the Amended Ordinance now prohibits HVCCs from accessing or using the Pedestrian Mall Areas in nearly all cases.

### B.  The Colorado Motor Carriers Association, and the Ordinance's Impacts on HVCCs' Delivery Activities

CMCA is an organization of motor carrier members who provide transportation services in Colorado (*see* ECF No. 14-2, ¶ 2). CMCA Members are licensed motor carrier companies, including some that are affiliated with a direct air carrier, that manage, coordinate, and schedule the movement of commercial goods throughout the state (*see id.*, ¶ 3). There are around 15,000 trucking companies in Colorado, and CMCA Members range from small, locally owned trucking businesses to large multinational HVCCs like UPS, FedEx, and DHL (*see id.*, ¶¶ 4–5). The services CMCA Members provide also vary widely and include, for instance, truckload or less-than-truckload shipping services, courier or parcel delivery services, shipping with either refrigerated trailers or dry van, shipping with pre-arranged delivery times, and hazardous materials delivery services (*see id.*, ¶ 6; ECF No. 14-3, ¶ 2; ECF No. 14-4, ¶¶ 2, 4, 10).

Delivery drivers for at least two of the major HVCCs—UPS and FedEx—undergo rigorous safety training and drug testing as part of their respective onboarding processes (*see* ECF No. 21 at 19:9–20:23, 46:21–47:13). Prior to either of the Original or Amended Ordinances, the Town had never issued a traffic citation to any delivery driver regarding their activities in the Pedestrian Mall Areas (*see id.* at 21:2–4, 47:25–48:4, 74:9–13). Similarly, UPS and FedEx drivers had never been involved in a traffic accident in the Pedestrian Mall Areas, nor had there been any reported safety incidents involving UPS (*see id.* at 20:24–21:1, 35:6–36:10, 47:17–22). There was one incident in which a FedEx

truck grazed a pedestrian while backing out of a parking space; the pedestrian was uninjured and declined to file a police report (*id.* at 68:20–69:25). Other than that, Chief Kenney recalled only "close calls" regarding delivery trucks operating around pedestrians in the Pedestrian Mall Areas (*see id.* at 35:1–12; *see also id.* at 96:21–97:12, 113:7–16).

In any event, customers frequently contract with CMCA Members (both HVCCs and non-HVCCs) to pick-up from and deliver goods to addresses in Vail, including within the Pedestrian Mall Areas (*see* ECF No. 14-2, ¶ 7; ECF No. 14-3, ¶ 5; ECF No. 14-4, ¶ 5; ECF No. 14-5, ¶ 5). Under the Original Ordinance, CMCA Members qualifying as HVCCs could drive motor vehicles on the streets in the Pedestrian Mall Areas without restriction[6] (ECF No. 14-2, ¶ 9; *see* ECF No. 21 at 62:21–24, 65:5–8). More specifically, there were several designated parking spaces[7] within those areas for delivery drivers to park their trucks and, on occasion, they could even drive directly to their customers' storefronts to drop off goods (*see* ECF No. 21 at 8:10–25, 26:6–27:21). With the benefit of this unfettered motor vehicle access to the Pedestrian Mall Areas, HVCCs could transport voluminous and bulky goods, and they could also schedule precise pickup and delivery

---

[6] And, of course, prior to either of the Original or Amended Ordinances, non-HVCCs and HVCCs alike could freely access the Pedestrian Mall Areas. When the Original Ordinance was enacted, non-HVCC delivery trucks were removed from the Pedestrian Mall Areas while HVCCs were allowed to stay. Following the Original Ordinance's enactment, it does not appear that any removed non-HVCCs challenged the new regulation on express preemption grounds or otherwise complained. Indeed, it appears that many (if not most) of these non-HVCCs instead participated in the E-Vail Courier pilot program voluntarily (*see, e.g.*, P.I. Ex. 17 at 1).

[7] In Vail Village, these parking spaces were located in the areas around Checkpoint Charlie, the intersection of Gore Creek Drive and Bridge Street (near Building 281), and the ice rink (between Buildings 122 and 141) (*see* P.I. Ex. 1; ECF No. 21 at 36:21–37:7, 46:2–10).

windows for their customers (*see* ECF No. 14-2, ¶ 6; ECF No. 14-3, ¶ 6; ECF No. 14-4, ¶ 6; ECF No. 14-5, ¶ 6).

Following the Amended Ordinance, HVCCs' options for completing their deliveries in the Pedestrian Mall Areas were much more limited. They could either:

1) Participate in the E-Vail Courier program by purchasing an annual dock permit, driving their trucks to any of the loading docks,[8] and tendering their goods to 106 West Logistics, whose staff would then complete the last leg of the delivery in the Pedestrian Mall Areas using electric carts (*see* P.I. Ex. 9 at 1; P.I. Ex. 17 at 1–2);

2) Park their trucks in one of six designated HVCC loading zones,[9] load their goods onto hand carts or pallet jacks, and complete their deliveries in the Pedestrian Mall Areas on foot (*see* P.I. Ex. 9 at 1–2; P.I. Ex. 17 at 2); or

3) For occasional trucks delivering oversized items or hazardous materials, obtain a single-use permit to enter the Pedestrian Mall Areas, which may be issued at the sole discretion of Town officials (*see* ECF No. 21 at 82:23–84:20).

CMCA Members qualifying as HVCCs have expressed various concerns with these options. With respect to the E-Vail Courier program, the fees to obtain a dock permit range from $3,000 up to $27,000 per year, based on factors such as the number of

---

[8] In Vail Village, the five available loading docks were Mountain Plaza, Solaris, Sebastian, Four Seasons, and One Willow. In Lionshead, the sole loading dock was the centralized hub at Arrabelle (*see* P.I. Exs. 1, 2; *see also* P.I. Ex. 9 at 1; P.I. Ex. 17 at 1–2).

[9] Four of these loading zones—Mountain Haus, First Bank, LTRC, and Hythe—contained designated HVCC parking spots with no time restrictions. Two others—Sebastian and Concert Hall Plaza—were 15-minute loading zones open to the public (*see* P.I. Exs. 1, 2; *see also* P.I. Ex. 9 at 1–2; P.I. Ex. 17 at 2).

delivery days per week, the number of delivery locations in the Pedestrian Mall Areas, the amount of time spent making deliveries at the dock, and the size of the company's delivery trucks (P.I. Ex. 18 at 2). A UPS representative testified that many of its deliveries are time-sensitive—both in terms of their customers' delivery windows, and in terms of the packages' perishable contents—and that tendering UPS's packages to 106 West Logistics does not guarantee that they will be delivered within their contractually agreed-upon timeframes (ECF No. 21 at 14:10–15:16, 17:11–18). Entrusting UPS packages to 106 West Logistics for the last leg of the delivery also presents issues for parcels requiring signatures and/or photographs proving that delivery had occurred at the correct address (*id.* at 15:17–17:10, 17:19–18:6). A FedEx representative testified similarly, explaining that tendering FedEx deliveries to 106 West Logistics instead of their intended recipients at the addresses listed on their bills of lading would violate their contractual obligations (*id.* at 44:15–45:13). Further, some FedEx services guaranteeing large deliveries within specified rooms of a business or residence would not be possible if those deliveries were instead entrusted to 106 West Logistics (*id.* at 42:19–43:4).

Regarding the designated loading zones, the UPS representative testified that the 15-minute public parking spaces (if they were available) were located in outlying areas and left delivery drivers with insufficient time to complete their pickups and deliveries in the Pedestrian Mall Areas (ECF No. 21 at 11:23–14:2, 18:7–22; *see id.* at 11:13–22). The FedEx representative likewise testified that their altered routes have created longer delivery times for palletized shipments, and that transporting pallets on foot from the designated loading zones—when such pallets commonly weigh hundreds or even

thousands of pounds—would be infeasible and dangerous for delivery drivers (*see id.* at 40:22–41:6, 51:19–52:7; *see also* P.I. Ex. 13).

Some businesses in the Pedestrian Mall Areas have complained about the Amended Ordinance's effect on their HVCC deliveries. For instance, one ski shop owner indicated that his business "had deliveries delayed, left unattended for hours without notice, . . . or just flat out not delivered," and that he was "regularly trying to call FedEx to reschedule and coordinate deliveries," which was a significant time cost (P.I. Ex. 10). Another ski shop owner related that because FedEx could no longer deliver directly to his storefront, he was recently forced to pick up 50 pairs of ski boots himself from FedEx's distribution center in Gypsum (P.I. Ex. 11).

Accordingly, on October 20, 2023, CMCA filed this action seeking (i) a declaratory judgment concluding that the Ordinance is expressly preempted by the FAAAA and ADA, and (ii) preliminary and permanent injunctive relief (*see* ECF No. 1). The instant preliminary injunction motion followed one week later (*see* ECF No. 13). On October 31, 2023, the Court granted a temporary restraining order enjoining the Amended Ordinance's enforcement but leaving the Original Ordinance in effect (*see* ECF No. 16). The Court then held hearings on the preliminary injunction motion on November 9 and 15, 2023 (*see* ECF Nos. 21, 26).

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes courts to enter preliminary injunctions. *See* Fed. R. Civ. P. 65(a). A preliminary injunction is an "extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort*

*Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (citation omitted). To prevail on a preliminary injunction motion, the movant bears the burden of showing that four factors weigh in their favor: (1) they are likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) this threatened injury outweighs any injury the injunction would cause the nonmovant; and (4) the injunction would not adversely affect the public interest. *See Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver, Colo.*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted); *accord Sierra Club v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013) ("A party seeking a preliminary injunction must prove that *all four* of the equitable factors weigh in its favor."). Where the government is the opposing party, the last two preliminary injunction factors merge. *See Denver Homeless*, 32 F.4th at 1278 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Pertinent here, preliminary injunctions affording all the relief that the movant could expect to win at trial are "disfavored," and in these instances, the movant must make a strong showing both on the "likelihood of success on the merits" and on the "balance of harms" factors. *See Free the Nipple*, 916 F.3d at 797 (quotation omitted).

## III.  ANALYSIS

The Court has reviewed CMCA's preliminary injunction motion and brief in support (ECF Nos. 13, 14), Vail's response (ECF No. 15), CMCA's reply (ECF No. 17), and the exhibits attendant with these filings. Likewise, the Court has considered the evidence and arguments presented during the parties' preliminary injunction hearing held on November 9, 2023, and continued on November 15, 2023 (*see* ECF Nos. 21, 26). For the following

reasons, the Court grants a preliminary injunction as to the Amended Ordinance, but leaves the Original Ordinance in effect.

## A.  Amended Ordinance

In granting the temporary restraining order in this case, the Court concluded that the relevant equitable factors weighed in favor of enjoining the Amended Ordinance's enforcement pending a hearing (*see* ECF No. 16 at 5–10). At the preliminary injunction stage, that conclusion remains essentially unchanged.[10] As set forth more fully below, CMCA has succeeded in showing that the Amended Ordinance is likely expressly preempted by the FAAAA and ADA, and that it does not come within the ambit of those statutes' safety exemptions. Likewise, CMCA has shown that it will likely suffer irreparable harm absent injunctive relief, and that the balance of equities tips in its favor.

### 1.  Likelihood of Success on the Merits

CMCA argues that it is reasonably likely to succeed on the merits because the Amended Ordinance is expressly preempted by the FAAAA and ADA (ECF No. 14 at 10–13).

The Supremacy Clause of the U.S. Constitution empowers Congress to preempt state law; because of the supremacy of federal law, "state law that conflicts with federal law is 'without effect.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)); *see* U.S. Const. art. IV, cl. 2. Pertinent here, express preemption of state law occurs when Congress "defines explicitly the extent

---

[10] This makes some sense—the parties' briefing was identical between CMCA's temporary restraining order and preliminary injunction motions (*compare* ECF No. 12 *with* ECF No. 14; *see also* ECF No. 15).

to which its enactments pre-empt state law." *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007) (quotations and alteration omitted). To determine whether a state law is expressly preempted by a federal preemption clause, courts "apply ordinary principles of statutory interpretation, looking initially to the plain language of the federal statute." *Day v. SkyWest Airlines*, 45 F.4th 1181, 1184 (10th Cir. 2022) (citation omitted).

The ADA provides that a state or political subdivision

> may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier or carrier affiliated with a direct air carrier through common controlling ownership when such carrier is transporting property by aircraft or by motor vehicle.

§ 41713(b)(4). Similarly, the FAAAA, which mirrors the ADA's preemptive framework, provides that a state or political subdivision "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." § 14501(c)(1); *see Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 370 (2008) (in enacting the FAAAA, Congress copied the ADA's preemption language).

Here, CMCA argues that the FAAAA and ADA expressly preempt the Amended Ordinance because it is "a law, regulation, or other provision . . . related to a price, route, or service of [] motor carrier[s]" (ECF No. 14 at 10). *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (in the ADA's language, the words "relat[ed] to" "express a broad pre-emptive purpose"). In so arguing, Plaintiff relies on *Rowe*, in which the U.S. Supreme Court explained that if the FAAAA preempts state laws that promote carriage,

logically "it must preempt state regulation of the essential details of a motor carrier's system for picking up, sorting, and carrying goods—essential details of the carriage itself." *Rowe*, 552 U.S. at 373. Plaintiff further references the Supreme Court's "connection with or reference to" preemption test set forth in *Day*:

> [A] state law has an impermissible "reference to" [carrier] prices, routes, or services if the law acts immediately and exclusively upon [carrier] prices, routes, or services, or if the existence of [carrier] prices, routes, or services is essential to the law's operations. A state law that does not "refer to" [carrier] prices, routes, or services under this test may nevertheless be preempted as impermissibly "connected with" them if the law (1) governs a central matter of [a carrier's] prices, routes, or services; (2) interferes with uniform national policies regarding [carrier] prices, routes, or services; or (3) will have acute economic effects that effectively limit [carriers'] choices regarding their prices, routes, and services. In applying this test, a state law is not preempted if it has only a tenuous, remote, or peripheral connection with [carrier] prices, routes, or services, as is the case with many laws of general applicability.

*Day*, 45 F.4th at 1186 (internal citations, quotation marks, and alterations omitted).

CMCA argues that the Amended Ordinance runs afoul of both the "reference to" and "connection with" portions of the *Day* test because, as set forth above, "it directly regulates the routes motor carriers can use and alters the services they can provide" (ECF No. 14 at 11). The Court agrees. For one thing, the Amended Ordinance acts immediately and exclusively upon, and thus, impermissibly "references," HVCCs' routes. Under the Original Ordinance, the Town specifically exempted HVCCs from its otherwise broad pronouncement that "all vehicular traffic is prohibited from accessing or using a pedestrian mall area," meaning that HVCCs were free to drive on the streets of the Pedestrian Mall Areas as necessary to complete their pickups and deliveries. *Vail Town Code* § 7-11-

3(A). The Amended Ordinance eliminated this exemption, such that the HVCCs' customary routes through the Pedestrian Mall Areas were no longer available to them. Moreover, the Amended Ordinance governs a central matter of, and is thus impermissibly "connected with," HVCCs' service offerings. Because HVCCs may no longer tender deliveries directly to their customers within the Pedestrian Mall Areas, they must, in most cases, either transport their goods on foot from designated HVCC loading zones or entrust their goods to 106 West Logistics for the last leg of the delivery. In turn, as described above, these options have posed impediments to HVCCs in their efforts to comply with their contractual delivery windows, obtain signatures for and/or photographs of their deliveries, and deliver goods within specified rooms of businesses and residences. The Town offers no serious argument countering the notion that the Amended Ordinance impacts HVCCs' routes and services in the Pedestrian Mall Areas within the meaning of *Day*.

This does not end the inquiry, however. The Town argues that the FAAAA and ADA do not expressly preempt the Amended Ordinance because both statutes exempt motor vehicle safety regulations from preemption, and that the Amended Ordinance is one such regulation (ECF No. 15 at 5–12). Pertinent here, the FAAAA contains, in a subsection titled "Matters not covered," an explicit safety regulation exception: "Paragraph (1) . . . shall not restrict the safety regulatory authority of a State with respect to motor vehicles . . . ." § 14501(c)(2)(A). The ADA contains nearly identical language: "Subparagraph (A) . . . shall not restrict the safety regulatory authority of a State with respect to motor vehicles . . . ." § 41713(4)(B)(i). The Town further argues that the

Ordinance falls within these exceptions to the FAAAA's and ADA's preemption provisions because the Ordinance is "genuinely responsive to safety concerns"—i.e., the Original Ordinance was enacted to "increase the safety of pedestrian traffic" and "reduce congestion" in the Pedestrian Mall Areas, and it was amended in 2023 to better address "pedestrian and vehicular circulation" in those areas (ECF No. 15 at 11).

In *City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424 (2002), the U.S. Supreme Court made clear that the FAAAA's safety regulation exception "shields from preemption only 'safety regulatory authority,'" and that "[l]ocal regulation of prices, routes, or services that is not genuinely responsive to safety concerns garners no exemption from § 14501(c)(1)'s preemption rule." *Id.* at 442. Put differently, the Amended Ordinance survives express preemption so long as it is "genuinely responsive to safety concerns." Neither the Supreme Court nor the Tenth Circuit, however, has spoken clearly on how to evaluate whether a local or state law is genuinely responsive to safety concerns. Other federal circuits to have considered this question have interpreted the safety regulation exception broadly in order to give effect "to Congress's desire to leave for the states and local governments those responsibilities regarding motor carriers that do not relate to the slender congressional goal of addressing *economic* authority over such carriers." *Cole v. City of Dallas*, 314 F.3d 730, 733 (5th Cir. 2002) (emphasis in original); *accord VRC LLC v. City of Dallas*, 460 F.3d 607, 612 (5th Cir. 2006) ("Case law . . . has on the whole given a broad construction to the safety regulation exception."); *California Tow Truck Ass'n v. City & Cnty. of San Francisco*, 693 F.3d 847, 859 n.12 (9th

Cir. 2012) ("*Ours Garage* . . . explained that the safety exception is not to be construed narrowly.") (emphasis removed).

As the Town correctly observes, the Fifth and Ninth Circuits have addressed this issue and have similarly analyzed expressions of legislative intent, as well the nexus between the law at issue and the safety concern it purported to address (*see* ECF No. 15 at 10–11). *See also VRC LLC*, 460 F.3d at 615–16; *California Tow Truck Ass'n*, 693 F.3d at 859–60. In *California Tow*, the Ninth Circuit articulated a more formal two-part test—which the Court finds persuasive and employs here in the absence of analogous Tenth Circuit authority—to determine whether a given law is genuinely responsive to safety concerns:

> First, courts consider available legislative or regulatory intent—ask whether safety relating to motor vehicles was truly a concern. Second, courts assess the nexus between the provision at issue and the safety concern—ask whether the regulation sufficiently "responds to" the concern. The first step examines any "expressions of legislative intent," including (1) the particular language of the statute or regulation being challenged, and any explicit statutory or regulatory findings in the provision; and (2) available legislative or regulatory history (e.g., committee reports, or statements of lawmakers). Once a safety motivation is identified, the second step looks to "the existing record evidence" to determine whether there is a "logical" or "genuine" connection between the regulation and the safety justification, or, instead, whether the purported safety justification is a pretext for undue economic regulation. The more attenuated or speculative the connection, the more likely it will be that a court will find the purported safety motives "illusory or pretextual" and that the safety justification will not withstand scrutiny.

*California Tow Truck Ass'n*, 693 F.3d at 860 (citations omitted).

With respect to the first prong of the *California Tow* inquiry, it is arguable that the Ordinance's enactment was spurred—at least in part—by concerns over motor vehicle safety vis-à-vis pedestrians. True enough, CMCA has produced ample evidence (e.g., memos from the Town's Loading and Delivery Work Group, as well as the Town's own press releases, podcasts, and promotional videos surrounding the E-Vail Courier program) indicating that the removal of delivery trucks from the Pedestrian Mall Areas was primarily intended to enhance the "guest experience," preserve Vail's mountain views and "rustic ski village" aesthetics, and reduce environmental impacts from parked, idling vehicles (*see, e.g.*, P.I. Ex. 15 at 1; P.I. Ex. 21 at 1; P.I. Ex. 22 at 1; P.I. Ex. 23 at 1; P.I. Ex. 24 at 1; *see also* P.I. Exs. 25, 26). But Chief Kenney also testified extensively that amending the Ordinance to remove HVCCs from these areas was further motivated by the Town's desire to reduce the hazards caused by delivery trucks and pedestrians sharing the same narrow streets, to wit, the risk of pedestrians being struck by a passing vehicle (*see, e.g.*, ECF No. 21 at 79:1–16). Likewise, Chief Kenney and the Town's Fire Chief both testified that the congestion from oversized delivery trucks posed serious safety issues for emergency vehicles attempting to navigate the Pedestrian Mall Areas (*see id.* at 131:17–134:11; ECF No. 26 at 69:8–73:1). That the Amended Ordinance appears not to have been *solely* justified as a function of motor vehicle safety is no barrier—where a regulation is motivated by safety concerns *and* economic or other concerns, "[t]he presence of such mixed motives . . . does not preclude the application of the safety exception, provided that the State's safety motives are not pre-textual." *California Tow Truck Ass'n*, 693 F.3d at 860 (quoting *Tillison v. Gregoire*, 424 F.3d 1093,

1102–03 (9th Cir. 2005)). Thus, broadly construing the FAAAA's and ADA's safety regulation exceptions as *Ours Garage* commands, the Court finds that safety relating to motor vehicles was a legitimate concern—although perhaps not the chief concern—of the Town in amending the Ordinance to remove HVCCs from the Pedestrian Mall Areas.

This leaves the second prong of the two-part *California Tow* inquiry—there must be a logical nexus between the Amended Ordinance and the Town's stated safety justification for enacting it. At this step, the notion that the Amended Ordinance falls within the safety regulation exception collapses. For one thing, the Amended Ordinance does not purport to regulate the passage of motor vehicles through the Pedestrian Mall Areas based on the relative risks they pose to pedestrians, but instead based on the owner of the vehicle or the purpose for which the vehicle is used. As CMCA has aptly put it, "the motor vehicles owned by CMCA's Members cannot access the Pedestrian Mall Areas when used by CMCA's Members to make deliveries. But those same vehicles could be used to 'enter[] or exit[] a parking structure to access a business or residence.' *Vail Town Code* § 7-11-4(G). Or they could be used by '[p]roperty owners and their guests [to] actively load[] or unload[].' *Id.* § 7-11-4(H). They could be used by 106 West Logistics. *Id.* § 7-11-4(D). And they could be used by anyone else so long as Vail 'authorized' it via a 'valid Town-issued permit.' *Id.* § 7-11-4(C)" (*see* ECF No. 17 at 17). Tellingly, Chief Kenney conceded that if two of the exact same type of vehicle attempted to enter the Pedestrian Mall Areas to deliver goods—one operated by 106 West Logistics and the other operated by an HVCC like FedEx or UPS—only the vehicle operated by the Town's

exclusive contractor, 106 West Logistics, would be allowed inside (*see* ECF No. 21 at 91:24–92:16; *see also id.* at 32:7–13).

No one on behalf of the Town has endeavored to explain why pedestrians in the Pedestrian Mall Areas are safer around motor vehicles operated by 106 West Logistics than they are around identical vehicles operated by other commercial carriers. This question is especially pressing in view of the facts that two of the largest HVCCs, FedEx and UPS, had *never* been cited for traffic violations in the Pedestrian Mall Areas, *never* injured a pedestrian in the Pedestrian Mall Areas, and had trained its delivery drivers extensively in safe motor vehicle operation. There was also no testimony that drivers for 106 West Logistics had a better or even comparable safety record than any of the major HVCCs with respect to pedestrians. Furthermore, no one on behalf of the Town has explained why it is unacceptably risky for HVCC trucks to operate in the Pedestrian Mall Areas, while other motor vehicles of similar types and sizes—such as public transportation buses, armored money vehicles, and waste and recycling collection trucks, *see Vail Town Code* § 7-11-4(A), (E), (F)—do not pose such risks and remain free to drive through those areas. In short, the Town has provided no satisfactory explanation for why the Amended Ordinance—which removes HVCC vehicles from the Pedestrian Mall Areas but abides the presence of other similar vehicles—is supposed to make pedestrians in those areas any safer.[11] Put even more simply, the Town has not demonstrated that the

---

[11] Perhaps from an intuitive standpoint, it makes sense why the Original Ordinance—which prevented an average of 140 non-HVCC delivery trucks per week from driving through the Pedestrian Mall Areas—would ensure pedestrian safety (*see* P.I. Ex. 17 at 1). By contrast, the Amended Ordinance—which removed roughly 2–4 parked, idling HVCC trucks per day from those areas—seems more calculated to ensuring that Vail's

Amended Ordinance actually responds to its purported concern for the safety of pedestrians.

Because the Town has not shown a clear nexus between the Amended Ordinance's exclusion of HVCCs from the Pedestrian Mall Areas and the need to ensure the safety of pedestrians in those areas, the Court finds that the Amended Ordinance is not "genuinely responsive to safety concerns" within the meaning of the *California Tow* test. Accordingly, the Amended Ordinance likely does not fall within the FAAAA's and ADA's safety regulation exceptions sufficient to save it from express preemption by those statutes. CMCA has thus met its burden to show its likelihood of success on the merits regarding its express preemption challenge to the Amended Ordinance.

### 2.  *The Remaining Equitable Factors*

As it did at the temporary restraining order stage, CMCA also argues that, aside from likelihood of success on the merits, the other equitable factors[12] favor the issuance of a preliminary injunction in this case (ECF No. 14 at 13–15). As before, the Court agrees.

Regarding the "irreparable harm" factor, CMCA "must demonstrate a significant risk that [it] . . . will experience harm that cannot be compensated after the fact by money damages." *Carranza v. Reams*, 614 F.Supp.3d 899, 917 (D. Colo. 2020) (quoting *Fish v.*

---

"iconic view of the Gore Range" remains unblemished (*see* ECF No. 25 at 01:00–01:30; ECF No. 26 at 35:21–36:2, 61:1–19).

[12] CMCA asserts that "[i]n an express preemption case, . . . the finding with respect to likelihood of success carries with it a determination that the other three requirements have been satisfied" (ECF No. 14 at 13 (quoting *VRC LLC*, 460 F.3d at 611)). Even granting that this assertion is probably correct, the Court nevertheless briefly analyzes the remaining preliminary injunction factors here, as it did at the temporary restraining order stage.

*Kobach*, 840 F.3d 710, 751 (10th Cir. 2016)). For substantially the same reasons the Court set forth when issuing the temporary restraining order in this case (*see* ECF No. 16 at 8–9), the Court remains convinced that CMCA will likely suffer such harm absent a preliminary injunction; to wit—

- If the Amended Ordinance remains in force, and the CMCA Members were subject to regulation by both the Town and the federal government, irreparable injury would result "by depriving the [carriers] of a federally created right to have only one regulator in matters pertaining to rates, routes, and services" (ECF No. 14 at 13–14 (quoting *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 783 (5th Cir. 1990) (*abrogation on other grounds recognized in Johnson v. Baylor Univ.*, 214 F.3d 630, 633 (5th Cir. 2000))).

- If the Amended Ordinance remains in force, irreparable injury would result from CMCA Members being forced to choose between violating the law and incurring any attendant penalties, or "suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review" (*id.* at 14 (quoting *Morales*, 504 U.S. at 381; *accord Am. Trucking Assocs., Inc., v. City of Los Angeles*, 559 F.3d 1046, 1057–58 (9th Cir. 2009))).

- "No amount of money damages can redress a CMCA Member's failure to timely deliver to a customer or a failure to deliver altogether" (*id.*). As described above, the Ordinance's enforcement so far has already resulted in multiple deliveries of commercial goods to customers within the Pedestrian Mall Areas being delayed, left unattended, or simply undelivered (*see* P.I. Exs. 10, 11).

Neither the Town's briefing nor its arguments at the preliminary injunction hearing have persuasively countered CMCA's assertion of irreparable harm in the absence of preliminary injunctive relief (*see* ECF No. 15 at 13–15; *see also* ECF No. 26 at 84:6–88:22).

Further, the Court maintains that the balance of equities tips in CMCA's favor. For one thing, the Town does not have a strong interest in enforcing a law that is reasonably likely to be found constitutionally infirm. *Chamber of Commerce of U.S. v. Edmonson*, 594 F.3d 742, 771 (10th Cir. 2010); *accord Utah Licensed Beverage Ass'n v. Leavitt*, 256

F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining potentially unconstitutional state statutes). Further, under the Supremacy Clause, "the relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138 (1988) (quotations and alteration omitted). As it was at the temporary restraining order stage, the Court remains unpersuaded by the Town's contrary arguments respecting the "balance of harms" and "public interest" factors (*see* ECF No. 15 at 15–16; *see also* ECF No. 26 at 84:6–88:22). Accordingly, the Court finds that CMCA has met its burden to show that the remaining preliminary injunction factors tip in its favor.

* * *

In light of the foregoing, CMCA has established that the issuance of a preliminary injunction is warranted. As such, the Amended Ordinance's enforcement will remain enjoined pending trial.

**B. Original Ordinance**

Separately, the Town maintains its previous argument that in the event a preliminary injunction is issued, the Court should not enjoin enforcement of the Ordinance wholesale, but rather, should enjoin enforcement of the Ordinance as amended in 2023 (*see* ECF No. 15 at 16–18). The Court agrees.

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390,

395 (1981)). As the Court explained at the temporary restraining order stage, the "status

quo" for this purpose is defined as "the last uncontested status between the parties which

preceded the controversy until the outcome of the final hearing" (*see* ECF No. 16 at 10–

11 (quoting *Schrier*, 427 F.3d at 1260)). *See also Free the Nipple*, 916 F.3d at 798 n.3

(describing the status quo as "the last peaceable uncontested status existing before the

dispute developed") (internal citations omitted). Here, before the Amended Ordinance's

enactment, neither CMCA nor any individual motor vehicle carrier challenged the Original

Ordinance restricting motor vehicle access from the Pedestrian Mall Areas. As such, the

period between the enactment of the Original Ordinance and the Amended Ordinance

remains the "last uncontested status between the parties."[13]

Moreover, CMCA's assertion that the Ordinance should be *completely* enjoined is

undercut significantly by the fact that the Original Ordinance was enacted more than a

year before this action was initiated. Courts in both this jurisdiction and others have

uniformly determined that a movant's delay in seeking injunctive relief warranted the

relief's denial. *See Harley's Hope Foundation v. Harley's Dream*, No. 22-cv-0136-WJM-

STV, 2022 WL 1154526, at *3 (D. Colo. Apr. 19, 2022) (collecting cases); *see also Colo.

Mont. Wyo. State Area Conf. of the NAACP v. United States Election Integrity Plan*, No.

22-cv-00581-PAB, 2022 WL 1061906, at *5 (D. Colo. Apr. 8, 2022) (waiting three months

to file motion for emergency injunctive relief without explanation "strongly undermines

---

[13] For this reason, the Court expresses no opinion on whether the Ordinance as originally
enacted in 2022 is preempted by the FAAAA and ADA, nor does it opine on whether it is
covered by those statutes' safety regulation exemptions. Those issues will be resolved at
trial.

plaintiff's suggestion that the moment of maximum harm is now at hand") (citation omitted); *Oakland Trib., Inc. v. Chron. Pub. Co*., 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Cheng v. Dispeker*, No. 94 CIV. 8716 (LLS), 1995 WL 86353, at *6 (S.D.N.Y. Mar. 2, 1995) ("[P]laintiffs waited five more months before moving for a preliminary injunction. Such a delay vitiates plaintiffs' assertion that they will be irreparably harmed if a preliminary injunction is not entered."); 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.") (citations omitted).

At bottom, CMCA's delay in seeking to enjoin the Original Ordinance belies its contention of irreparable harm and defeats its motion for preliminary injunction as to that version of the Ordinance. Accordingly, the Court maintains that while *completely* enjoining the Ordinance's enforcement would be inappropriate, a preliminary injunction enjoining the enforcement of the Amended Ordinance is warranted.

## IV.  CONCLUSION

Consistent with the above analysis, CMCA's preliminary injunction motion is GRANTED IN PART. Defendants remain ENJOINED from enforcing the Amended Ordinance (Ordinance No. 18, Series 2023) until further Order of the Court. The Original Ordinance (Ordinance No. 15, Series 2022) remains in full force and effect.

DATED this 15th day of December 2023.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge